IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

LION OIL COMPANY                                                    PLAINTIFF

vs.                                    Civil No. 13-CV-1071

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA, *et al.*                                 DEFENDANTS

### <u>MEMORANDUM OPINION</u>

Before the Court is a Motion for Summary Judgment filed by Defendants.[1]  ECF No. 68.

Plaintiff has filed a response.  ECF No. 73.  Defendants have filed a reply.  ECF No. 76.  Plaintiff

has filed a sur-reply, and Defendants have filed a response to the sur-reply.  ECF Nos. 81-1 and 84-1.

The matter is ripe for the Court's consideration.

## I.  BACKGROUND

Plaintiff Lion Oil Company ("Lion Oil") has owned and operated an oil refinery in El

Dorado, Arkansas since 1985.  Defendants are insurers and underwriters of insurance policies under

which Lion Oil unsuccessfully attempted to recover money for losses sustained at Lion Oil's refinery

in El Dorado, Arkansas.  Lion Oil filed this action alleging a breach of contract claim and seeking

a declaration that Defendants are obligated to cover Lion Oil's losses under the policies.

---

[1]The named Defendants in this case are as follows and will be collectively referred to as "Defendants" in this Order:
National Union Fire Insurance Company, PA; Great Lakes Reinsurance (UK) PLC; Ace American Insurance Company;
XL Insurance America, Inc.; Torus Specialty Insurance Company; Certain Underwriters at Lloyds-Talbot Syndicate
1183; Certain Underwriters at Lloyds-Navigators Syndicate at Lloyds 1221 and Pembroke Syndicate at Lloyds 4000;
Certain Underwriters at Lloyds-SJC 2003/Catlin; Certain Underwriters at Lloyds-Brit Insurance, Syndicate 2987; Certain
Underwriters at Lloyds-Chaucer Marine Syndicate 1084; Berkshire Hathaway International Insurance Limited; Arch
Insurance Company; Landmark American Insurance Company; Lexington Insurance Company; and Ironshore Specialty
Insurance Company.

A.  El Dorado Refinery and Pipeline

Lion Oil's  El Dorado refinery processes approximately 80,000 barrels of crude oil per day and produces refined products such as gasoline, diesel fuel, and asphalt.  Lion Oil receives oil from a pipeline known as the North Line, which is owned and operated by EMPCo, a subsidiary of ExxonMobil.  The North Line runs from St. James, Louisiana, to Longview, Texas, and it consists of approximately 200 miles of pipe.

B.  Pipeline Inspection (2007) and Rupture (2012)

In 2007, EMPCo inspected the North Line for defects in the seam weld of the pipeline.  This inspection identified anomalies at various locations along the North Line.  The inspection vendor misidentified one particular defect as a seam weld anomaly that was unlikely to cause a failure.  This particular seam weld anomaly, however, caused the pipeline to rupture at a point near Torbert, Louisiana on April 28, 2012.

After the rupture occurred, EMPCo shut down the pipeline and notified the Department of Transportation Pipeline and Hazardous Material Safety Administration ("PHMSA"), the regulatory entity responsible for pipeline safety.

C. PHMSA Corrective Action Order

On May 8, 2012, the PHMSA issued a Corrective Action Order ("CAO") to EMPCo.  The CAO required EMPCo to take several corrective actions, including the following: (1) develop and submit a written re-start plan for PHMSA's approval; (2) undertake a failure analysis of the ruptured section; and (3) submit an "integrity verification and remedial work plan."  ECF No. 1-1, pp. 5-6.[2]

---

[2]Each page number from ECF documents referenced in this Order refers to the page number contained in the ECF heading.

The integrity verification plan was required to include, among other items, the following: (1) a metallurgical analysis, failure analysis, and an integrated compilation of relevant pipeline system data; (2) field testing to assess whether conditions that caused the failure or other integrity threatening conditions were present elsewhere in the pipeline; and (3) provisions for long-term testing and verification measures.  ECF No. 1-1, p. 6.  Regarding the field testing plan, the CAO stated that "confirmatory hydrostatic testing must be considered in the plan"[3]  ECF No. 1-1, p. 6.

The damaged section of the pipeline had been excavated, removed, and replaced my mid-May 2012.  It was not until October 2012, however, that EMPCo submitted the required integrity verification plan to the PHMSA, which included EMPCo's election to perform a hydrostatic pressure test.  The test was intended to verify the pipeline's integrity as required by the CAO and to reestablish the maximum operating pressure.  EMPCo planned to perform the hydrostatic pressure test along approximately 200 miles of the North Line pipeline, including sections that had not been damaged by the April 28, 2012 incident.  The PHMSA approved the integrity verification plan and incorporated the plan into the CAO.

The hydrostatic testing began in July 2012 and lasted until September 2012. EMPCo discovered seven leaks during the hydrostatic testing, and it located and repaired each leak.  In October 2012, the PHMSA granted EMPCo permission to restart the pipeline.  Lion Oil began receiving crude oil from the EMPCo pipeline in March 2013.

---

[3]Hydrostatic testing requires evacuation of the oil from the pipeline, filling the pipeline with water, increasing the pressure, and holding the pressure for a designated time period.

D.  Insurance Policies

At the time of the rupture, Defendants provided insurance to Lion Oil pursuant to certain "all-risk" insurance policies.[4]  The policies were not identical, but the parties agree that the relevant coverage and exclusion terms were the same.  The policies provided coverage to Lion Oil for "all risk of direct physical loss of or damage to property described herein, except as hereinafter excluded."  ECF No. 1-2, p. 30.  Thus, certain perils were excluded from coverage.  For example, the policy did not insure against the cost of making good faulty workmanship or latent defects.

The policies provided coverage for contingent time element loss subject to the policies' terms, conditions, and exclusions.  The contingent time element coverage insured against loss resulting from damage to property that wholly or partially prevented a direct supplier from rendering their goods to the insured.  The policies included a time element deductible of either 30 or 45 days as to the El Dorado refinery.

Lion Oil submitted a contingent business interruption claim of approximately $44 million and an extra expense claim of approximately $36 million for the losses it sustained during the time the El Dorado refinery did not receive crude oil from the EMPCo pipeline.  In September 2013, Defendants denied Lion Oil's claims.

In 2013, Lion Oil filed the instant action alleging a breach of contract claim and seeking a declaration that Defendants are obligated to cover Lion Oil's claims for financial losses under the policies.  Defendants argue that Lion Oil's claims for financial loss are not covered under the insurance policies.  Defendants, therefore, ask the Court to grant summary judgment in their favor.

---

[4]These policies were in effect from May 1, 2011, to May 1, 2012.

## III. DISCUSSION

Summary judgment is appropriate when there is no genuine issue of material fact and the record entitles the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(a). When making this determination, the Court views the evidence in the light most favorable to the non-moving party. *Progressive Northern Ins. Co. v. McDonough.*, 608 F.3d 388, 390 (8th Cir. 2010), and the Court gives the non-moving party the benefit of all reasonable inferences that can be drawn from the facts. *Auto Club Ass'n v. States Sentry Ins.*, 683 F.3d 889, 891 (8th Cir. 2012).

Summary judgment is particularly appropriate where the unresolved issues are primarily legal rather than factual. *Koehn v. Indian Hills Cmty Coll.*, 371 F.3d 394, 396 (8th Cir. 2004); *see John Deere Ins. Co. v. Shamrock Indus., Inc.*, 929 F.2d 413, 417 (8th Cir. 1991) (noting that "the interpretation and construction of insurance policies is a matter of law, and therefore, such cases are particularly amenable to summary judgment"). In addition, when an issue of law has been joined by both parties in a summary judgment motion, the Court may enter judgment in favor of the non-moving party notwithstanding the non-moving party's failure to file a formal motion. Fed. R. Civ. P. 56(f); *Home Ins. Co. v. Waycrosse, Inc.*, 990 F. Supp. 720, 727 (D. Minn. 1996).

The parties agree that interpretation of the insurance policies in this diversity case is governed by Arkansas substantive law. *See id*. ("'Interpretation of an insurance policy is a matter of state law.'") (quoting *Stan Koch & Sons Trucking, Inc. v. Great W. Cas. Co.*, 517 F.3d 1032, 1039 (8th Cir. 2008)). Arkansas law requires the Court to apply the following rules of general construction. Words must be construed in their plain, ordinary popular sense. *Langley v. Allstate Ins. Co*., 995 F.2d 841, 845 (8th Cir. 1993) (applying Arkansas state law). "Contracts of insurance should receive a practical, reasonable, and fair interpretation consonant with the apparent object and intent of the

-5-

parties in light of their general object and purpose." *Parker v. S. Farm Bureau Cas. Ins. Co.*, 292 S.W.3d 311, 315 (Ark. Ct. App. 2009). A court must consider the whole policy to determine the meaning of a particular clause within it. *Cont'l Cas. Co. v. Davidson*, 463 S.W.2d 652, 655 (Ark. 1971). "Whatever the construction of a particular clause standing along may be, it must be read in connection with other clauses limiting or extending the insurer's liability." *Id*.

In Arkansas, if the language of the policy is unambiguous, a court will give effect to the plain language of the policy without resorting to the rules of construction. *Elam v. First Unum Life Ins. Co.*, 57 S.W.3d 165, 169 (Ark. 2001); *see Smith v. S. Farm Bureau Cas. Ins. Co.*, 114 S.W.3d 205, 206-07 (Ark. Ct. App. 2003) (stating that the language of an insurance policy should be construed in its "plain, ordinary, and popular sense"). "On the other hand, if the language is ambiguous," a court "will construe the policy liberally in favor of the insured and strictly against the insurer." *Elam*, 57 S.W.3d at 169.

"Language is ambiguous if there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one reasonable interpretation." *Id*. "Ordinarily, the question of whether the language of an insurance policy is ambiguous is one of law to be resolved by the court;" however, where "parol evidence has been admitted to explain the meaning of the language, the determination becomes one of fact for the jury to determine." *Id*.

"[W]here there is a dispute as to the meaning of a contract term or provision, be it an insurance or other contract, the trial court must initially perform the role of gatekeeper, determining first whether the dispute may be resolved by looking solely to the contract or whether the parties rely on disputed extrinsic evidence to support their proposed interpretation." *Id.* "Thus, where the issue of ambiguity may be resolved by reviewing the language of the contract itself, it is the trial court's

duty to make such a determination as a matter of law." *Id*.  Where the parties, however, go beyond

the contract and submit disputed extrinsic evidence to support their proffered definitions of the term,

there is a question of fact for the jury.  *Id*.

A.  Coverage

All risk policies are designed to protect an insured in cases where loss or damage to property

is difficult or impossible to explain.  *See Pillsbury Co. v. Underwriters of Lloyd's*, 705 F.Supp. 1396

(D. Minn. 1989).  Here, the "perils insured against" by the insurance policies at issue included "all

risk of direct loss of or damage to property described herein, except as hereinafter excluded."  ECF

No. 1-2, p. 30.  In addition, the policies provided Time Element Coverage.  The insurance policies

also included certain extensions to the Time Element Coverage.

The Contingent Time Element extension insured against losses resulting from damage to

property that wholly or partially prevented a direct supplier from rendering their goods to the insured.

The specific language of the policy is as follows:

Time Element Extensions

(a) This policy, subject to all provisions and without increasing the limits of
this policy, also insures against loss resulting from damage to or destruction
by causes of loss insured against, to:
. . . .

(ii) Contingent Time Element: property that wholly or partially
prevents any direct supplier of goods and/or services to the Insured
from rendering their goods and/or services, or property that wholly or
partially prevents any direct receiver of goods and/or services from
the Insured from accepting the Insured's goods and/or services, such
supplier or receiver to be located anywhere in the Policy Territory.

-7-

ECF No. 1-2, p. 17.  Thus, to trigger coverage under the Contingent Time Element provision of the policy, it must be established that a "direct supplier of goods and/or services" suffered property damage that prevented the supplier "from rendering [its] goods and/or services" to Lion Oil.

Defendants argue that the cause of the interruption to the delivery of oil to Lion Oil's refinery was not property damage.  Defendants assert that the interruption was actually caused by EMPCo's decision to inspect its pipeline for defects that might cause future events.  According to Defendants, the April 28, 2012 rupture caused damage to only one section of the pipeline—the section that contained the seam weld failure.  Defendants argue that, when this damaged section was replaced on May 17, 2012, the pipeline was fully repaired and capable of transporting oil.  Because the physical damage to the property was repaired within the 30-day deductible for the potential coverage, Defendants argue that there was no property damage that prevented EMPCo from delivering oil to Lion Oil's refinery beyond May 17, 2012.  Stated another way, once the damaged section of the pipeline was physically replaced, the extended closure of the pipeline and the resulting losses suffered by Lion Oil no longer "resulted from" the April 28, 2012 rupture.

To support their argument, Defendants rely heavily on a case decided by the Tenth Circuit Court of Appeals, *MarkWest Hydrocarbon, Inc. v. Liberty Mutual Insurance Co.*, 558, F.3d 1184 (10th Cir. 2009).  In *MarkWest*, a pipeline owned and operated by the insured ruptured.  The section that was damaged was replaced within the deductible period for time element coverage.  The governmental regulatory agency, however, required hydrostatic testing of several miles of additional pipe to search for and remediate integrity threatening conditions.  The appellate court rejected the insurance claim of the pipeline owner and operator for costs incurred to hydrostatically test the pipeline after the ruptured section had been replaced.  The Court held that the costs resulting from

-8-

the search for integrity threatening conditions were not covered under the all risk insurance policy. The Tenth Circuit reasoned that "[t]o read the policy as covering MarkWest's costs of complying with safety regulations would be to convert the parties' policy against unforseen fortuities into a maintenance contract." *Id.* at 1192.

The *MarkWest* case is distinguishable from the present case in that Lion Oil is not the owner and operator of the pipeline that ruptured, and thus the contingent financial losses for which it seeks coverage is factually different from cases where the insured seeks coverage for damage to its own property. Unlike the owner and operator in *MarkWest*, Lion Oil had no control over the maintenance of the pipeline or any testing that was done following the rupture. Thus, any concerns regarding "convert[ing] the parties' policy against unforseen fortuities into a maintenance contract" do not apply to the facts in the present case.

Defendants assert that the interruption of the delivery of oil past May 17, 2012, was not caused by property damage. Lion Oil, however, argues that there is no language in the insurance policies to support Defendants' argument that coverage ended when the repair was made to the damaged section of pipe. Lion Oil asserts that Contingent Time Element Coverage is an extension of coverage that simply requires the occurrence of property damage that prevents a named supplier from delivering goods to the policyholder. According to Lion Oil, as long as property damage has occurred, the losses "resulting from" such damage are covered. Lion Oil states that nothing more than a simple "but for" analysis is required: but for the pipe's rupture, Lion Oil's loss would not have occurred.

The 2012 rupture caused a CAO to be issued that required EMPCo to submit a restart plan. The restart plan that included hydrostatic testing was approved by the PHMSA, and incorporated into

the CAO.  Lion Oil's position is that EMPCo's decision to test the pipeline following the rupture does not constitute a separate cause of loss independent from the rupture.  In sum, Lion Oil argues that its claims for contingent financial losses are causally connected to the property damage that occurred to the pipeline; therefore, its claims are covered by the insurance policies.

The Court cannot enter summary judgment on this issue because a question of fact exists as to causation.  Coverage requires that Lion Oil's losses must result from damage to property that prevents a supplier from delivering its goods to Lion Oil.  The plain language of the policy does not automatically limit claims for loss to the length of time it would take to repair the damaged property.  There is no dispute that physical damage to a supplier's property occurred here.  EMPCo's pipeline ruptured on April 28, 2012, causing a 17-foot seam to open up in the pipeline.  A dispute exists, however, as to whether it was the rupture to the pipeline or EMPCo's decision to hydrostatically test the pipeline following the rupture that was the dominant and efficient cause of Lion Oil's loss.  *See Shelter Mut. Ins. Co. v. Maples,* 309 F.3d 1068, 1071 (8th Cir. 2002) (applying Arkansas law and concluding that a factual question existed as to whether a covered peril or excluded peril was the dominant and efficient cause of the insured's loss); *Lynch v. Travelers Indem. Co.*, 452 F.2d 1065, 1067 (8th Cir. 1972) (applying Arkansas law and finding sufficient a jury instruction on dominant, direct, and efficient cause of loss); LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INS. §§ 148:60, 148:61 (3d ed. 1998) (where covered and non-covered perils join to cause loss, and the covered peril is the efficient and dominant cause, there is coverage under the policy).  It appears to the Court that this determinative question is a factual one that prevents the Court from entering summary judgment in favor of Defendants.  *See Maples,* 309 F.3d at 1071; *Massi's Greenhouses, Inc. v. Farm Family Mut. Ins. Co.*, 233 A.D.2d 844, 844 (N.Y.App. Div. 1996) (Where an insured sought to recover for

-10-

damages associated with removal, clean-up and loss of business after its greenhouse geraniums suffered bacterial contamination and a state quarantine order was issued, the court found that the question of whether the losses were caused by the quarantine order or by the contamination should be decided by a trier of fact.).

    B. Exclusions

Defendants assert that, even assuming Lion Oil's loss was caused by property damage, Lion Oil is not entitled to coverage for its loss because the damage to the pipe was caused by at least one of two excluded perils. Defendants assert that two separate exclusions apply to Lion Oil's claims: the exclusion for the "cost of making good ... faulty workmanship" and the exclusion for "latent defect."

Once it is determined that coverage exists,[5] the Court must then determine whether the exclusionary language within the policy eliminates the coverage. *Castenada v. Progressive Classic Ins. Co.*, 166 S.W.3d 556, 560 (Ark. 2004). "Exclusionary endorsements must adhere to the general requirements that insurance terms must be expressed in clear and unambiguous terms." *Farmers Ins. Exchange v. Bradford*, 460 S.W.3d 810, 813 (Ark. Ct. App. 2015). It is unnecessary to resort to the rules of construction to ascertain the meaning of an insurance policy when no ambiguity exists. *Fulton v. Beacon Nat. Ins. Co.*, 416 S.W.3d 759, 762 (Ark. Ct. App. 2012). When the provision is unambiguous and only one reasonable interpretation is possible, the Court will give effect to the plain language of the policy. *Bradford*, 460 S.W.3d at 813. "Where language is unambiguous, summary judgment is an appropriate method to resolve issues of contract construction." *Fulton*, 416 S.W.3d at 762.

---

[5]In the present case, as mentioned in the previous section, a jury will make this coverage determination.

If the language is found to be ambiguous, the insurance policy is read against the insurer who prepared the policy. *Wintermute v. Kan. Bankers Sur. Co.*, 630 F.3d 1063, 1070 (8th Cir. 2011) (applying Arkansas law) (citing *Smith v. Farm Bureau Mut. Ins. Co. of Ark., Inc.*, 194 S.W.3d 212, 218 (Ark. App. 2004)). "If the policy can reasonably be construed to justify recovery, or if the policy language is susceptible to two interpretations, the court must adopt the interpretation most favorable to the insured." *Id.*

### A.  Cost of Making Good Faulty Workmanship

The "Perils Excluded" section of the policy states that the policy does not insure "against the cost of making good defective design or specifications, faulty material, or faulty workmanship; however, this exclusion shall not apply to loss or damage resulting from such defective design or specifications, faulty material, or faulty workmanship."  ECF No. 1-2, p. 30.

Defendants argue that all loss suffered by Lion Oil constitutes the "cost of making good" the faulty workmanship and are excluded from coverage.[6]  In other words, Lion Oil's contingent loss is included as part of the cost of making good the faulty workmanship and is not a separate loss. Essentially, Defendants are relying on a "but for" analysis, arguing that Lion Oil would not have sustained the business interruption losses but for the defective welds.  Thus, Lion Oil's financial loss should be considered a part of the "cost of making good" the defective work.

Lion Oil, of course, disagrees with Defendants' interpretation of the exclusion.[7]  Lion Oil argues that a plain reading of the exclusion in conjunction with an understanding of Lion Oil's claim

---

[6]For analysis purposes, the Court assumes without deciding that the defect in the pipe section was caused by faulty workmanship.

[7]Lion Oil also seeks judgment in its favor pursuant to Fed. R. Civ. P. 56(f)(1).

leads to only one logical conclusion: "the cost of making good" exclusion cannot apply to Lion Oil's contingent financial loss because Lion Oil is not making a claim for any costs it incurred to "make good" or repair the faulty workmanship in the EMPCo pipeline.  Lion Oil's property was not damaged by the faulty workmanship, so logically any cost associated with correcting the faulty workmanship in the pipeline is of no concern to Lion Oil.  Lion Oil, however, is concerned about its contingent business interruption loss that it claims to have incurred as a result of the pipeline rupture.

The natural reading of the plain language of the exclusion is consistent with Lion Oil's interpretation:  that business interruption loss does not constitute the "cost of making good" faulty workmanship.  The exclusion language does not except *all* loss related to faulty workmanship.  The language only excepts the cost of making good the faulty workmanship.  The second clause in the exclusion, which adds back coverage for *loss resulting from* faulty workmanship, would be unnecessary if the exclusion purported to except all costs related to the weld defects.  The Court must read the exclusion's two clauses together.  It is clear that the exclusion's second clause narrows the meaning of the phrase "cost of making good" to show that "damage resulting from ... faulty workmanship" is a loss distinct and separate from the "cost of making good" the faulty workmanship.[8]  Thus, the "cost of making good" must refer to the specific cost of replacing or repairing damaged property due to faulty workmanship and not to any contingent loss or consequential damages stemming from the faulty work.

---

[8]Defendants state in their brief that "[t]o 'make good' the defect, EMPCo needed only to replace the section of pipeline that contained the defect."  ECF No. 69, p. 26.

Applying this interpretation to the facts of this case leads to only one reasonable conclusion: that Lion Oil's claimed financial loss from a business interruption is distinct and separate from the cost to make good the weld defect in the pipe.  Thus, Lion Oil's contingent business interruption loss does not logically fall within the narrow meaning of the phrase "cost of making good ... faulty workmanship."  Defendants have not met their burden in showing the applicability of the "cost of making good" exclusion.[9]  Lion Oil, therefore, is entitled to summary judgment on this legal issue.

B.  Latent Defect

The "Perils Excluded" section of the policy states that the policy does not insure against "latent defect ... unless loss or damage not otherwise excluded ensues and then this policy shall cover for such ensuing loss or damage."  ECF No. 1-2, p. 30.  The policy does not define the term "latent defect."  This, however, does not necessarily render the term ambiguous.  *See Essex Ins. Co. v. Holder*, 261 S.W.3d 456, 458 (Ark. 2007) ("The fact that a term is not defined in a policy does not necessarily render it ambiguous.").  The parties and the Court have found only one Arkansas case that discusses what constitutes a latent defect.  In that case, the Arkansas Supreme Court reasoned that a latent defect is one that is "not discoverable by a careful inspection."  *Hall v. Patterson*, 166 S.W.2d 667, 671 (Ark. 1942).  By comparison, in an opinion more recent than *Hall*, the Court of Appeals for the Eighth Circuit has stated that a defect is latent when it cannot be discovered by a person of competent skill using ordinary care.  *Gibbar v. Calvert Fire Ins. Co.*, 623 F.2d 41, 44 (8th Cir. 1980).  The Court notes, however, that the Court of Appeals was not applying Arkansas law.

---

[9]Because the Court finds that the faulty workmanship exclusion does not apply, the Court will not address whether Lion Oil's damages are covered under the ensuing loss exception to the faulty workmanship exclusion.

Defendants argue that the seam weld imperfection that caused the pipeline rupture was an excluded latent defect.  Plaintiff, however, argues that the seam weld imperfection was not latent because it was discoverable by a careful inspection.  Further, Plaintiff points that the imperfection was, in fact, actually discovered by the 2007 inspection of the pipeline.

To properly understand the latent defect issue, additional background information regarding the 2007 inspection  is necessary.  In 2007, EMPCo hired a vendor to inspect the pipeline at issue.  An in-line inspection device was run through the pipeline to look for defects in the seam weld of the pipeline.  The inspection tool detected 411 seam weld anomalies at various locations along the pipeline, including at the location of the 2012 rupture.  These seam weld anomalies were then graded or classified into three categories.  The inspection report noted a total of 14 Seam Weld Feature A defects that exhibited characteristics associated with crack-like defects.  The report noted a total of 37 Seam Weld Feature B defects that exhibited some but not all of the characteristics associated with crack-like defects.  The report further noted that 360 Seam Weld Anomalies were detected that were not considered to be crack-like, but displayed some sort of weld abnormality.  The report stated that a "Seam Weld Anomaly is a manufacturing defect in the seam weld that is unlikely to cause a failure mechanism for the pipeline in the future."  ECF No. 73-39, p. 8.  The defect that led to the 2012 rupture was one of the 360 detected anomalies that fell into this category.

Neither Plaintiff nor Defendants argue that the term "latent defect" is ambiguous.  Plaintiff and Defendants have submitted extrinsic evidence, including expert deposition testimony and other documents, to support their respective interpretations of "latent defect" as applied to the facts of this case.  This extrinsic evidence, however, is not in conflict, and the facts that surround this issue are not in dispute.  The parties agree that the 2007 test was reasonable and was conducted using state-of-

the-art inspection tools.  The parties further agree that the 2007 inspection detected an anomaly at

the site of the 2012 rupture; however, this particular anomaly was misidentified.  In fact, Plaintiff's

expert, W.R. (Bill) Byrd, testified in his deposition that he had reviewed the deposition testimony

of Defendants' expert Steve Koetting, and  could not recall anything in Koetting's deposition that

Byrd disagreed with.  ECF No. 78-2, p. 3.  A term in an insurance contract may become ambiguous

if the parties submit disputed extrinsic evidence to support their proffered interpretations of the

policy.  *See Elam*, 57 S.W.3d at 170.  Where the parties' extrinsic evidence is not in conflict,

however, it is the Court's duty to determine whether the policy language is ambiguous.  *Smith v.*

*Farm Bureau Mut. Ins. Co. of Ark.*, 194 S.W.3d 212, 221 (Ark. Ct. App. 2004).  "'[T]he construction

and legal effect of written contracts are matters to be determined by the court, not by the jury, except

when the meaning of the language depends upon disputed extrinsic evidence.'"  *Id*. at 219 (citing

*Southall v. Farm Bureau Mut. Ins. Co.*, 632 S.W.2d 420 (1982)).

Defendants argue that, because the inspection did not reveal to EMPCo that the particular

seam weld anomaly was likely to cause a failure, the anomaly was not and could not be discovered

upon reasonable inspection.  To support this argument and to show that the misidentification was

not just a one-time error, Defendants offer deposition testimony from Koetting.  Koetting testified

that, after the 2012 rupture, the vendor that performed the 2007 inspection indicated that "our

analysis called it the way we would call it today."  ECF No. 73-15, p. 11.  Defendants, however, do

not cite to any authority to support their argument that a discovered defect could be regarded as

"latent" simply because an inspection vendor incorrectly categorizes the severity of the anomaly.

The Court finds that there is no doubt or uncertainty as to the meaning of the term "latent

defect."  Further, the meaning of this term does not depend upon disputed extrinsic evidence.  Thus,

the term is not ambiguous.  The fact that the test results regarding the anomaly at issue were misinterpreted does not mean that the anomaly was not discoverable.  The anomaly was discovered during the 2007 inspection.  It was after the discovery of the anomaly that the vendor misidentified it as an anomaly not likely to cause a rupture.  Thus, applying the definition of latent defect to the facts of this case leads to only one reasonable conclusion:  the defect at issue is one that was discoverable upon careful inspection.  Accordingly, Defendants have not met their burden in showing the applicability of the "latent defect" exclusion.[10]  Lion Oil, therefore, is entitled to summary judgment on this legal issue pursuant to Fed. R. Civ. P. 56(f)(1).

### III.  CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (ECF No. 68) is **DENIED**.  Pursuant to Fed R. Civ. P. 56(f)(1), as to the two exclusion issues, summary judgment is **GRANTED** in favor of Plaintiff.  The Court will issue a Judgment of even date consistent with this Opinion.

IT IS SO ORDERED, this 10th day of September, 2015.

/s/ Susan O. Hickey
Susan O. Hickey
United States District Judge

---

[10]Because the Court finds that the latent defect exclusion does not apply, the Court will not address whether Lion Oil's damages are covered under the ensuing loss exception to the latent defect exclusion.